Andrew L. Schlafly (AS4533)
Attorney at Law
939 Old Chester Rd.
Far Hills, NJ 07931
(908) 719-8608
*Attorney for Plaintiffs Robert B. Patel, M.D.,*
*and Mid-Atlantic Medical Associates, LLC*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **ROBERT B. PATEL, M.D., and** | ) |
| **MID-ATLANTIC MEDICAL** | ) |
| **ASSOCIATES, LLC,** | ) |
|  | ) |
| **Plaintiffs,** | ) |
|  | ) **Civil Action** |
| **vs.** | ) |
|  | ) **No. _____** |
| **MERIDIAN HEALTH SYSTEM, INC.,** | ) |
| **SCOTT LARSEN, TIMOTHY HOGAN,** | ) |
| **ANTHONY CAVA and GEORGE YOUNAN,** | ) |
|  | ) |
| **Defendants.** | ) |
| _____ | ) |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Robert B. Patel, M.D. ("Patel"), and Mid-Atlantic Medical

Associates, LLC ("Mid-Atlantic Medical"), each located at 721 North Beers

Street, Suite 2G, Holmdel, New Jersey 07733, and 1 Beekman Rd., Suite 5,

Kendall Park, New Jersey 08824, by and through their counsel, seek

injunctive relief and damages against Defendants Meridian Health System,

Inc. ("Meridian"), located at 1350 Campus Parkway, Neptune, New Jersey

07753, and Scott Larsen, Timothy Hogan, Anthony Cava and George Younan, all located at Bayshore Community Hospital, 727 North Beers Street, Holmdel, NJ 07733, as follows:

## Nature of the Action

1.    Plaintiffs bring this action based on the anticompetitive and racketeering conduct of Defendants in summarily suspending, without any valid quality-of-care issue or risk of any imminent harm, Plaintiff Patel from Bayshore Community Hospital ("Bayshore").  Defendants then interfered with the independence of the Medical Executive Committee at Bayshore by denying them a secret ballot.  Defendants extorted and blackmailed three other physicians at Plaintiff Mid-Atlantic Medical who, like Plaintiff Patel, are of Indian descent, in an attempt to intimidate them into resigning from the Bayshore medical staff.

2.    Defendants based their action on Plaintiff Patel's transfers of approximately three patients per month to hospitals having a higher level of care.  Each of these transfers was entirely proper – as confirmed by a multi-disciplinary committee convened by Defendants themselves at Bayshore. Undeterred in their wrongdoing, Defendants next resorted to an immaterial administrative issue, non-urgent and unrelated to the quality of care, which Defendants had never discussed with Plaintiff Patel:  whether his offsite

office complied with Defendants' demands on trivial matters such as whether his name is on the door. Defendants later admitted that the applicable Bayshore Medical and Dental Staff Bylaws ("Bylaws") do not require this; if Defendants had discussed this with Plaintiff, it could have been easily resolved. Instead, Defendants were determined to destroy these Indian American physicians.

3.    Defendants Scott Larsen, Timothy Hogan, Anthony Cava, and George Younan engaged in the forgoing wrongful conduct for personal gain, in concert with Defendant Meridian. Though registered as a Section 501(c)(3) nonprofit organization having an obligation to serve the public good, Meridian acquired Bayshore and proceeded to pay grossly inflated compensation to Meridian executives and certain Defendants as they restrict patient options at Bayshore. For their own enrichment, Defendants interfered with transfers of patients from Bayshore to a higher level of care elsewhere, and harshly punished Plaintiff Patel for standing up for patients' rights to be transferred to hospitals better able to care for them.

4.    Defendants' actions violated Section 1 of the Sherman Act, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and the Americans with Disabilities Act ("ADA"), causing injury to Plaintiffs. Defendants' actions also violated the New Jersey Law Against

Discrimination ("NJLAD"), breached the contract memorialized in the applicable Bylaws, and defamed Plaintiff Patel.

5.     Plaintiffs seek damages for their lost revenue and reputation as a result of Defendants' actions against them, and injunctive relief to prevent recurrence of these violations and to order the reinstatement of the full privileges of Plaintiff Patel to Bayshore as a member of its medical staff.

<u>**The Parties**</u>

6.     Plaintiff Robert B. Patel, M.D. ("Patel"), is a licensed physician who practices in New Jersey.  He has medical staff privileges at several hospitals in north-central New Jersey, and is board-certified in internal medicine.

7.     Plaintiff Mid-Atlantic Medical Associates, LLC ("Mid-Atlantic Medical") is a limited liability New Jersey corporation.  It is organized under the laws of New Jersey, where it employs several physicians.  Plaintiff Mid-Atlantic Medical is owned by Plaintiff Patel.

8.     Defendant Meridian Health System, Inc., operates Bayshore, and is registered as a New Jersey non-profit corporation.

9.     Defendant Scott Larsen, M.D. ("Larsen"), is the Vice President of Clinical Effectiveness at Bayshore.

10.     Defendant Timothy Hogan ("Hogan") is the Regional President

of Bayshore.

11.    Defendant Anthony Cava ("Cava") is the Chief Operating Officer of Bayshore.

12.    Defendant George Younan, M.D. ("Younan"), is the President of the Medical Staff of Bayshore.  Defendant Younan is in private practice and is not an employee of this hospital.

## Jurisdiction

13.    This action arises under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble the amount of damages incurred by Plaintiffs as a result of the violation by Defendants of Section 1 of the Sherman Act, 15 U.S.C. § 1; under Section 16 of the Clayton Act, 15 U.S.C. § 26, to secure equitable relief against a continuation of the violations; under RICO, 18 U.S.C. §§ 1961-1968; and under ADA, 42 U.S.C. § 12101 *et seq*.  Interstate commerce for medical services is substantially affected by Defendants' conduct alleged herein.  This court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1337(a).

14.    Supplemental jurisdiction over Plaintiffs' additional claims for violation of the NJLAD, breach of and tortious interference with contract, and defamation exists under 28 U.S.C. § 1367.

## **Venue**

15.    Venue is proper in the United States District Court for New Jersey under 15 U.S.C. § 22 and 28 U.S.C. § 1391.  All parties reside in this district, the events giving rise to the claims occurred here, and each party transacts business within the District of New Jersey.

## **Allegations Relevant to All Counts**

16.    Bayshore is the only hospital serving the community at Holmdel, New Jersey, whose residents rely on it for emergent care services.

17.    Defendant Meridian has dominant market power by owning and operating Bayshore and two other hospitals in northern and eastern Monmouth County (including the northern Jersey Shore), controlling more than 50% of the market there for emergent care.  This encompasses roughly a million residents, travelers and tourists.

18.    Although registered as a nonprofit organization, Defendant Meridian pays its executives and individual Defendants excessive compensation inconsistent with its charitable status, including the following in 2010:

$1,781,748 to John K. Lloyd;
$1,789,278 to Marc H. Lory;
$707,935 to Defendant Hogan;

and more than $500,000 per year in compensation to at least ten other

executives.    Overall, Defendant Meridian enriches a small number of administrators with compensation totaling more than $10 million annually.

19.    Defendant Meridian has funded its excessive administrative compensation by acquiring community hospitals based on false promises to improve the quality of care there, followed by reducing patient choice and interfering with transfers of patients to a higher level of care elsewhere.

20.    Specifically, in 2009 Defendant Meridian announced its intention to acquire and operate Bayshore based on Meridian's promise to "enhance the level of care and service to the community" there.  (Meridian press release dated July 29, 2009).

21.    Based on its representation to "enhance the level of care" at Bayshore, Defendant Meridian completed its acquisition on September 1, 2010.

22.    Defendant Meridian and the other Defendants subsequently embarked on a concerted effort to destroy the independence of the medical staff at Bayshore and interfere with the transfers of patients elsewhere.

23.    The quality of care at Bayshore is now significantly below that of Robert Wood Johnson University Hospital and other hospitals in New Jersey which have an independent medical staff.

24.    Specifically, at Meridian-operated Bayshore, the ratio of

patients to nurses is now 3:1 in the Intensive Care Unit ("ICU") – *i.e.*, only 1 nurse for every 3 ICU patients – while at Robert Wood Johnson University Hospital, this ratio is a far better 2:1 – *i.e.*, 1 nurse for every 2 ICU patients.

25.    This ratio of nurses to patients is a strong indicator of the level of care.

26.    Robert Wood Johnson University Hospital also has a higher level of care for cardiology services than Bayshore, an important consideration for the many patients who have cardiac problems.

27.    A lower level of care at Bayshore is further indicated by how Defendant Larsen, whom Meridian pays more than $300,000 for powerful administrative duties, also moonlights there without accountability.

28.    As one illustration of the lower level of care provided by Defendant Larsen, he inappropriately discharged a patient having necrotizing fascilitis, which in layman's terms is flesh-eating bacteria.  That patient predictably worsened after Larsen sent him home, to the point where he returned to the hospital with a life-threatening, septic-like condition.

29.    A lower level of care at Bayshore is further illustrated by how the Medical Staff President Defendant Younan, a cardiologist who poorly documents his work in medical records, employs his two sons in his own practice and thereby has an enormous conflict of interest concerning

referrals of numerous patients at Bayshore who have heart problems.

## Transfers of Patients to a
## Higher Level of Care at Other Hospitals

30.    In 2011, Plaintiff Patel and his associates at Plaintiff Mid-Atlantic Medical joined the medical staff as independent physicians at Bayshore, not employed by the hospital.

31.    In April 2012, Defendant Anthony Cava (who is not a physician) disparaged Plaintiff Patel for having transferred some patients to Robert Wood Johnson University Hospital, which is widely known to provide a higher level of care than Bayshore.

32.    During the course of the prior year, Plaintiff Patel had transferred roughly three dozen patients to other hospitals – averaging about three transfers per month – to receive a higher level of care at other hospitals, including Robert Wood Johnson University Hospital.

33.    Defendants objected to these transfers of these patients for purely self-interested economic reasons, rather than for the quality of care of the patients.  Defendant Meridian loses potential revenue because it cannot bill for services rendered to patients after they are transferred.  Defendant Younan is a cardiologist who would have made more money for himself and his sons if the patients had been referred to him for cardiac services.  The future compensation of Defendants Cava, Larsen and Hogan, also depends

in part on Meridian holding more patients at Bayshore.

34.    In addition, Meridian has sought to reduce competition from independent physicians by excluding Plaintiffs.

35.    Further illustrating Defendants' financial motivation for interfering with transfers by Plaintiff Patel, Defendants sought for Plaintiff Patel to order tests, just prior to the transfers, for which Meridian could bill and receive payments, even though the same tests would necessarily be repeated by the receiving hospital.

36.    Each of the transfers of patients by Plaintiff Patel was fully approved by the receiving hospital.

37.    Plaintiff Patel received no personal benefit from transferring these patients to other hospitals.

38.    Indeed, Plaintiff Patel's transfers of these patients required him to perform substantial uncompensated work, including completing extensive paperwork; it would have been far easier for Plaintiff Patel not to transfer these patients, but he did what was best for the patients.

39.    Defendants convened a multi-disciplinary committee at Bayshore in an attempt by Defendants to find fault with these transfers.

40.    Defendant Larsen falsely insisted before the multi-disciplinary committee that Plaintiff Patel had improperly transferred patients, and voted

to find fault with respect to these patient transfers.

41.    The overwhelming majority of Bayshore's own multi-disciplinary committee rejected Defendant Larsen's complaints, and found that these transfers by Plaintiff Patel were entirely appropriate.

## The Summary Suspension of Plaintiff Patel

42.    In late April and May 2012, Plaintiff Patel was not transferring any patients from Bayshore, and there was no basis for Defendants to intervene.

43.    Despite the finding by Bayshore's multi-disciplinary committee that Plaintiff Patel's prior transfers of patients were appropriate, Defendants summarily suspended Patel's hospital privileges on May 11, 2012.

44.    Defendants summarily suspended Plaintiff Patel's hospital privileges at Bayshore by sending him a letter on that date, approved by Defendants Meridian and Cava, signed by Defendants Hogan and Younan, and emailed by Defendant Larsen to Plaintiff Patel.

45.    This letter had Defendant Meridian on the letterhead, and Meridian authorized it.

46.    This letter and email were in furtherance of Meridian's goals to eliminate competition through misuse of summary suspension.

47.    This letter and email were sent to Plaintiff Patel after 6pm on a

Friday, and no one answered the telephone number that the letter provided for Plaintiff Patel to call.

48.    Federal policy establishes that summary suspensions of a physician's hospital privileges be limited to "where the failure to take such an action may result in an ***imminent danger to the health of any individual***." 42 U.S.C. §11112(c)(2) (emphasis added).

49.    Defendants did not cite any "imminent danger to the health of any individual" as a basis for their summary suspension of Plaintiff Patel, and there was no such basis.

50.    Defendants did not cite any urgency requiring that this action "must be taken immediately in the best interest of patient care or the other functions of the Hospital" (Bylaws Section 9.2.1), and there was no such urgency.

51.    Despite the finding in favor of Plaintiff Patel by the Bayshore multi-disciplinary committee, Defendants stated that their summary suspension of Plaintiff Patel was due to his transfers of patients to other hospitals.

52.    Defendants could have simply prohibited transfers by Plaintiff Patel, or required another physician to approve any such transfers; this reason could not possibly support a summary suspension of entire privileges.

53.     Defendants also provided a new administrative reason for their summary suspension, which Defendants had never discussed with Plaintiff Patel, never gave him notice of, and never allowed him an opportunity address or remedy.

54.     Defendants' new administrative basis for the summary suspension was an assertion that the Bylaws require "an active practice in the area served by the Hospital," implying that Plaintiff Patel must have an outside office in the area, which he does have but Defendants ignored.

55.     In fact, the Bylaws do not require an outside office in the area by physicians who work at the hospital.

56.     The Bylaws require only that the physician be "actively practicing" in the area, which Plaintiff Patel does by practicing at the hospital and by seeing patients as needed at an office he shares with another physician.

57.     Many other physicians having privileges at Bayshore lack an outside office, and yet Defendants do not object to them.

58.     Defendants had accepted and approved Plaintiffs' lease arrangement for their outside office on or about November 1, 2011, and had never objected to it after receiving a copy of Plaintiffs' lease.

59.     By not raising any objection to Plaintiffs' arrangement for an

outside office for six months after receiving a copy of the lease, Defendants waived any right to object to the arrangement later.

60.    In or about May 2012, Defendants began using the arrangement for an outside office as a pretext for the summary suspension motivated by Defendants' anti-competitive, fraudulent, and retaliatory motivations.

61.    In or about early May 2012, Defendants arranged for a secret visit and the taking of pictures of Plaintiffs' outside office in order to claim it was deficient because it allegedly did not have his name on the outside door, when in fact Defendants later admitted that the Bylaws do not require that a physician have his name on the outside door.

62.    Defendants complained that another physician used Plaintiffs' office, when in fact the Bylaws do not prohibit independent physicians from sharing expenses with other physicians to reduce overhead.

63.    Defendants insisted that Plaintiff Patel did not see any patients at his outside office, when in fact he had seen a patient there the prior week.

64.    Defendants did not seek to discover the true office arrangement or resolve the issue with Plaintiff Patel because they did not object to the arrangement and raise it now only as a pretext for the summary suspension motivated by their anti-competitive, fraudulent, and retaliatory purposes.

65.    Defendants    provided    no    connection    between    this    new

administrative issue and the quality of care.  There is not a single instance of any impact on patient care arising from this administrative issue.

66.    Defendants provided no urgent basis necessitating a summary suspension, even on the pretextual reasons they provided, and there was no urgency justifying a summary suspension.

67.    Defendants' demands, even if not pretextual, for certain requirements relating to an outside office nonetheless would be anticompetitive, contrary to public policy, and unenforceable.

68.    Any deficiencies by Plaintiff Patel or physicians associated with Plaintiff Mid-Atlantic Medical in maintaining an outside office are immaterial to the Bylaws and any other requirement for obtaining or maintaining privileges at Bayshore.

69.    Any deficiencies by Plaintiff Patel or physicians associated with Plaintiff Mid-Atlantic Medical in maintaining an outside office can be easily remedied upon request by Defendants.

70.    This summary suspension of Plaintiff Patel by Defendant Meridian, a nonprofit 501(c)(3) organization, was in violation of its obligation to promote the public good.

71.    This summary suspension of Plaintiff Patel caused him immediate, irreparable harm, and injured his professional reputation.

## Medical Executive Committee (MEC) Meeting

72.     Upon receiving this summary suspension on May 11, 2012, Plaintiff Patel immediately exercised his right under the Bylaws to request a meeting of the Medical Executive Committee ("MEC") to review it.

73.     The Bylaws Section 9.2.2(a) require holding a meeting of the MEC within three business days, which required this meeting to be held no later than May 16, 2012.

74.     Defendants did not hold the MEC meeting until May 17, 2012, which Plaintiff Patel then attended.

75.     Defendants intimidated members of the MEC such that some MEC members declined to attend, and others, realizing it was a sham, walked out of the meeting before a vote was taken.

76.     Defendants arranged for hostile, unjustified questioning of Plaintiff Patel by one of Meridian's employees from a different hospital owned by Meridian, who typically does not even practice at Bayshore.

77.     Defendants arranged for the unjustified berating of Plaintiff Patel at the MEC meeting for transferring patients at Bayshore to a higher level of care at other hospitals, even though the multi-disciplinary committee at Bayshore had already determined the transfers were proper.

78.     Plaintiff Patel expressly requested that a vote on his summary

suspension be made by a secret ballot, and that the outcome be verified by two voting members of the MEC.

79.    Defendants denied the ability of MEC members to cast their votes by secret ballot with verification of the outcome by two MEC voting members.

80.    Defendants denied the secret ballot in order to intimidate the voting members and improperly influence their votes.

81.    Physicians on the MEC who disagreed with the summary suspension felt coerced, due to Defendants' intimidation, to vote for it.

82.    At least one voting member of the MEC vocally objected to how the meeting was being conducted, and expressly voted against the continuation of the summary suspension of Plaintiff Patel.

83.    By letter dated May 21, 2012, Defendant Hogan informed Plaintiff Patel that the MEC voted to affirm the summary suspension and also voted to recommend termination of his appointment at Bayshore based primarily on the fraudulent claim that the transfers of patients by Plaintiff Patel were somehow improper.

84.    Defendant Hogan's letter added two additional reasons for the MEC decisions which were also false, without any basis in fact.  Hogan stated that Plaintiff Patel was "[f]ailing to actively practice medicine in the

area served by the Hospital in violation of Section 3.3.1(d) of the Bylaws," when in fact Plaintiff Patel had been actively practicing medicine at the Bayshore hospital.

85.    Hogan further stated in his May 21, 2012, letter that Plaintiff Patel had made a misrepresentation in a communication about his outside office "with [unnamed] Hospital officials," when in fact no Bayshore officials had communicated any concern with Plaintiff Patel about his current outside office.

86.    Subsequent to the MEC meeting Defendant Larsen, acting in concert with the other Defendants, telephoned three (3) Indian American women physicians associated with Plaintiff Mid-Atlantic Medical, who are all board-certified in internal medicine.

87.    Defendant Larsen contacted these three physicians and extorted them by demanding that they relinquish their hospital privileges – a form of property – or else be reported to government authorities.

88.    Defendant Larsen also blackmailed these physicians by demanding their cooperation or else Defendants would harm their reputations by making disparaging reports about them.

89.    Defendants' actions were not taken in the reasonable belief that it was in furtherance of quality health care.

90.    Defendants' actions were not based on a reasonable effort to obtain the facts of the matter.

91.    Defendants' actions were not done after adequate notice and hearing procedures were afforded to the physician involved.

92.    Defendants' actions were not undertaken in the reasonable belief that their actions were warranted by the facts known.  Defendants also failed to make a reasonable effort to obtain the facts and further failed to satisfy the applicable the notice and hearing requirements.

## Count I

### (Restraint of Trade in Violation of Section 1 of the Sherman Act)

93.    Plaintiffs incorporate herein all statements and allegations contained in this Complaint.

94.    Defendants acted in concert to restrain trade by improperly summarily suspending the hospital privileges of Plaintiff Patel at Bayshore.

95.    Defendants acted in concert to arrange a joint boycott of Plaintiff Patel's services in the relevant market of the Holmdel area for emergent care, and in the broader market for emergent care in northern and eastern Monmouth County (including the northern Jersey Shore).

96.    Defendants' agreement to take draconian punitive action against Plaintiff Patel was far more excessive than what would have been

justified even under the fraudulent and pretextual case that they built against him, and in furtherance of their agreement Defendants reported their baseless action against Plaintiff Patel to a New Jersey government authority in order to cause a boycott of his services throughout all of New Jersey.

97.    Any requirement that Plaintiff Patel maintain a separate, more expensive offsite office as a condition of maintaining privileges is anticompetitive and contrary to public policy.

98.    Defendants' actions were undertaken with a common design, understanding, and unity of purpose to exclude Plaintiffs from the relevant market, thereby constituting an unlawful agreement under Section 1 of the Sherman Act and Section 4 of the Clayton Act.

99.    Defendants' concerted actions produced anticompetitive effects within the Holmdel market, and also within the northern and eastern region of Monmouth County, for the emergent care services provided by Plaintiffs.

100.    Defendants' concerted actions reduced the competition for emergent care services for newly admitted patients, as provided by Plaintiffs.

101.    Defendants' concerted actions reduced the availability of greater options for care, including higher quality care, of patients.

102.    Defendants' concerted actions imposed, and continue to

impose, an unreasonable restraint on trade that has an anticompetitive effect on the relevant market of Holmdel and also the northern and eastern region of Monmouth County.

103.   Defendants' concerted actions to exclude Plaintiff Patel and Plaintiff Mid-Atlantic Medical's other physicians is a *per se* violation of antitrust laws because it is plainly anticompetitive, like a group boycott of a supplier; Defendants' foregoing actions tend to restrict competition and decrease output with respect to emergent care services for newly admitted patients.

104.   In the alternative, Defendants' concerted actions are unlawful pursuant to the rule of reason, by unreasonably excluding competition without any pro-competitive justification for the collusion.

105.   The purpose and the effect of the exclusion of Plaintiff Patel and his associates from the relevant market are anticompetitive, reducing the availability of physicians for the call schedule and limiting the number of physicians available to patients, thereby injuring consumers of medical care by imposing less efficacious care.

106.   Patients who travel from New York and other states to the Holmdel area are deprived, as a result of Defendants' foregoing actions, from receiving Plaintiff Patel's services, thereby substantially affecting

interstate commerce.

107.    Defendants' concerted actions have deterred and discouraged other physicians on staff at Bayshore from providing transfer and other services to patients, thereby harming the consumers of medical services.

108.    Defendants' concerted actions have directly and proximately caused Plaintiffs to lose revenue from the services that Plaintiff Patel and other physicians associated with Plaintiff Mid-Atlantic Medical would have provided to patients had they not been excluded and intimidated.

109.    Plaintiffs have lost market share and patient volume as a direct result of Defendants' foregoing violation of Section 1 of the Sherman Act.

110.    This exclusion of Plaintiffs from the relevant market has reduced the quality and quantity of services available for patients, and reduced the overall output of emergent care services for newly admitted patients in this market.

111.    Patients are unlikely to sue for the loss in the quality and quantity of emergent care services, and thus there is no potential for duplicative recovery or complex apportionment of damages.

112.    Plaintiffs will continue to suffer injury to their business and property in the future unless such acts and practices by Defendants are terminated.

## Count II

### (Violation of the Racketeer Influenced and Corrupt Organizations Act)

113.   Plaintiffs incorporate herein all statements and allegations contained in this Complaint.

114.   Defendants utilized Meridian as their enterprise for their pattern of racketeering activity under RICO.

115.   Meridian is engaged in interstate commerce.

116.   The individual Defendants are associated with Meridian.

117.   In a press release dated July 29, 2009, Defendant Meridian used email to falsely represent to the public that it would improve the level of care for the Holmdel community by acquiring Bayshore, omitting how Meridian would instead enrich itself, its executives and individual Defendants, by interfering with patient transfers and destroying independent physicians who provide a high level of care at Bayshore.

118.   Defendant Larsen, acting in concert with the other Defendants, utilized email and Federal Express on May 11, 2012, to distribute a statement that Plaintiff Patel had ordered transfers of patients contrary to patients' best interests.  Defendants made this statement with knowledge, or reckless disregard of the truth, that this statement was false, but sent it by email and Federal Express to Plaintiff Patel and others in order to deprive

Plaintiff Patel of property – his hospital privileges at Bayshore – and to secure that revenue stream for themselves. Recipients of this email from Defendant Larsen then attended the MEC convened to deprive Plaintiff Patel of his hospital privileges.

119. Defendants engaged in this scheme with an intent to defraud Plaintiff Patel of his hospital privileges at Bayshore and the accompanying revenue stream, which they sought to secure for themselves along with the increased revenues from patients retained at Bayshore when a transfer would have been in the patients' interest.

120. At the MEC meeting on May 17, 2012, Defendants engaged in bias intimidation against voting members of the MEC by denying a request for a secret ballot and proper verification of the vote outcome, and by implicitly threatening retaliation against physicians based on their vote, in order to obtain a vote to summarily suspend Plaintiff Patel and approve the removal by coercion of three additional Indian Americans from the medical staff. These actions by Defendants violated N.J. Stat. § 2C:16-1.

121. On or about May 18 and 19, 2012, Defendant Larsen, acting in concert with other Defendants, telephoned three physicians affiliated with Plaintiff Mid-Atlantic Medical, and used blackmail and extortion in an attempt to coerce them into relinquishing their hospital privileges.

122.   By letter dated May 21, 2012, which was emailed and sent by Federal Express to Plaintiff Patel, Defendant Hogan stated that the MEC voted to recommend termination of the appointment of Plaintiff Patel based primarily on the fraudulent assertion – initiated by non-physician Hogan himself – that the transfers of patients were somehow inappropriate. Hogan's letter contained additional fraudulent assertions about Plaintiff Patel, insisting that he somehow failed "to actively practice medicine in the area of the Hospital" (Patel was actively practicing there) and that he made material misrepresentations in his communication about his outside office with unnamed "Hospital officials" (there were no such communications).

123.   Upon information and belief, Defendants plan to continue to use deceit, bias intimidation, blackmail and/or extortion to enrich themselves by depriving additional independent physicians of their hospital privileges at Bayshore and at additional hospitals that Meridian seeks to acquire.

124.   Defendants have engaged in, and continue to engage in, a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organization Act (RICO).

## Count III

### (Violation of the
### Americans with Disabilities Act)

125.   Plaintiffs incorporate herein all statements and allegations

contained in this Complaint.

126. Defendants own and operate Bayshore.

127. Plaintiff Patel was engaged in protected activity under ADA by transferring patients to other hospitals better able to care for and accommodate them.

128. These transferred patients were unable to care for themselves.

129. Several of these transferred patients were less than 65 years old but on Medicare, reflecting how they were suffering from disabilities.

130. One of the transferred patients suffered from the disability of blindness.

131. Plaintiff Patel's protected activity under ADA caused Defendants to retaliate against him by summarily suspending his hospital privileges.

132. Plaintiff Patel opposed the holding of patients at Bayshore when they should have been transferred to accommodate their disabilities, and Defendants discriminated against Patel for his opposition by suspending him.

133. Defendants expressly admitted, in writing, that their summary suspension of Plaintiff Patel was based on his transfers of patients to other hospitals.

134.   Defendants' violation of ADA was willful.

## Count IV

### (Violation of the New Jersey Law Against Discrimination)

135.   Plaintiffs incorporate herein all statements and allegations contained in this Complaint.

136.   Plaintiff Patel, and the other physicians associated with Plaintiff Mid-Atlantic Medical, belong to a protected class as individuals of Indian origin.

137.   Plaintiff Patel, and the other physicians associated with Plaintiff Mid-Atlantic Medical, were qualified to maintain their medical staff privileges at Bayshore, which they properly obtained in 2011.

138.   Defendants, who are all white, summarily suspended Plaintiff Patel and threatened to summarily suspend his associates at Plaintiff Mid-Atlantic Medical, all of whom are of Indian descent.  This disciplinary action was far more severe than Defendants' treatment of white physicians in analogous situations, in violation of the New Jersey Law Against Discrimination ("NJLAD").

139.   Defendants interpret the Bylaws in a discriminatory manner against Plaintiff Patel and his associates at Plaintiff Mid-Atlantic Medical, in order to impose conditions on them for an outside office which are not

imposed on white physicians at Bayshore, in violation of the NJLAD.

140.   Defendants have imposed far less severe penalties against white physicians who have incurred far more serious infractions, including conduct by white physicians which has been harmful to the quality of care.

141.   Defendants discriminatory treatment of Plaintiff Patel and Plaintiff Mid-Atlantic Medical's employees constituted a disparate disciplinary action giving rise to an inference of discrimination in violation of the New Jersey Law Against Discrimination, including N.J. Stat. § 10:5-4.

142.   Defendants' retaliation against Plaintiff Patel for transferring patients, alleged in detail in Count III above, was also in violation of NJLAD.

## Count V

### (Breach of Contract)

143.   Plaintiff Patel incorporates herein all statements and allegations contained in this Complaint.

144.   Medical staff bylaws constitute a written contract under applicable New Jersey law.

145.   Plaintiff Patel has been on the medical staff at Bayshore at all relevant times and was a party to this contract (the Bylaws) with Defendants.

146.  Plaintiff Patel fully performed all of his obligations under contract (the Bylaws).

147.  Plaintiff Patel did not breach the Bylaws in any material way.

148.  Defendants materially breached their contractual obligations under the Bylaws by summarily suspending Plaintiff Patel without satisfying the Bylaws requirement that a summary suspension be imposed only if it "must be taken immediately in the best interest of patient care or the other functions of the Hospital" (Bylaws Section 9.2.1).

149.  Defendants' summary suspension denies Plaintiff Patel his rights under the Bylaws to care for newly admitted patients.

150.  Defendants provided no prior notice of their issue with Plaintiff Patel's office prior to summarily suspending him.

151.  Defendants materially breached their contractual obligations under the Bylaws by failing to allow the MEC to meet in private free from the intimidating presence of non-MEC administrators, and by failing to allow an independent vote by the MEC using a secret ballot with verification of the outcome by two voting MEC members, as requested by Plaintiff Patel and required by the implied covenant of good faith and fair dealing under New Jersey common law and the circumstances.

152.  By relying on allegations against Plaintiff Patel which

Defendants knew or should have known were false, and in imposing a penalty that was far harsher than what was appropriate or justified, Defendants violated their implied covenant of good faith and fair dealing under New Jersey common law for a contract (the Bylaws).

153. Defendants further materially breached their contractual obligations under the Bylaws by failing to provide for a meeting and vote by the MEC within three (3) business days of Plaintiff Patel's request (Bylaws § 9.2.2(a)), and in delaying four (4) more days before notifying Plaintiff Patel of the result. These improper delays have unjustifiably prolonged the injury to Plaintiff Patel from the draconian penalty of summary suspension, and hindered his ability to challenge it immediately.

154. Defendants' summary suspension of Plaintiff Patel was in violation of the express federal minimum standard for summary suspensions, as set forth in the Health Care Quality Improvement Act ("HCQIA"). This summary suspension was not based on legitimate peer review, and in fact constituted a sham peer review. Defendants' actions did not comply with the immunity provisions of HCQIA.

155. Any interpretation by Defendants of the Bylaws to require Plaintiff Patel to maintain a more expensive outside office is anticompetitive, contrary to New Jersey public policy, and unenforceable.

156.    Defendants failed to provide Plaintiff Patel with an opportunity to cure any perceived deficiency under the Bylaws.

157.    The deficiency alleged by Defendants with respect to an outside office is immaterial and would be easily cured by Plaintiffs, upon notice.

158.    Defendants' actions proximately caused injury in the form of lost revenue and reputational harm to Plaintiff Patel.

## Count VI

### (Tortious Interference with Contract)

159.    Plaintiff Patel incorporates herein all statements and allegations contained in this Complaint.

160.    Defendants knew of the Bylaws and knew that they establish contractual obligations.

161.    Defendants interfered with this contract (the Bylaws) by insisting on a summary suspension of Plaintiff Patel's privileges without justification and without full and fair consideration and independent decision-making by the MEC, preventing use of a secret ballot and proper verification of the balloting outcome as requested.

162.    Defendants' actions constituted an intentional, wrongful and wanton interference with the Bylaws, contrary to New Jersey public policy.

163.    Plaintiff Patel had a reasonable expectation of an economic

benefit from the contractual protections of the Bylaws.

164.   The foregoing interference with the contractual obligations has proximately caused Plaintiff Patel to lose revenue.

## Count VII

## (Defamation)

165.   Plaintiff Patel incorporates herein all statements and allegations contained in this Complaint.

166.   Defendants asserted false and defamatory statements about Plaintiff Patel, asserting that he had committed a very serious breach of his professional responsibilities that would justify the draconian action of a summary suspension.

167.   Defendants published these statements in an unprivileged manner to third parties, including without limitation Defendants' informing administrators and physicians who were not on the Medical Executive Committee.

168.   Defendants' publication of these statements was in bad faith and not privileged.

169.   Defendants' publication of these statements included, but was not limited to, distributing to others a letter signed by Defendants Younan and Hogan dated May 11, 2012, without taking reasonable steps to protect

its confidentiality, and subsequently repeating Defendants' false assertions by sending a report about the summary suspension to a governmental authority.

170.   Defendant Hogan then sent another letter to Plaintiff Patel and others dated May 21, 2012, without taking reasonable steps to protect its confidentiality, which essentially repeated Defendants' false assertions.

171.   Defendants' statements defamed Plaintiff Patel by falsely representing and implying that he had a quality-of-care deficiency so severe that it justified the draconian sanction of a summary suspension.

172.   Defendants repeated their defamatory statements about Plaintiff Patel to third parties, spreading the falsehoods through the medical community.

173.   The defamatory statements about Plaintiff Patel caused his colleagues (upon whom Patel relies for referrals) and patients to falsely think that Patel's professional services were somehow so egregiously improper and inadequate that a summary suspension was necessary to restrain him.

174.   Defendants knew that their statements disparaging Plaintiff Patel were false.  In the alternative, to the extent that any of the Defendants did not know their statements were false, then those Defendants were negligent in publishing them.

175.   Defendants' communications constituted libel *per se* by impugning the professional services and conduct of Plaintiff Patel.

176.   Plaintiff Patel is not a public figure.

177.   Despite being informed about the falsehoods in the statements about Plaintiff Patel, Defendants have not retracted them.

178.   Defendants' defamatory statements were willful and wanton.

179.   Defendants' foregoing actions have proximately caused injury to Plaintiff Patel by harming his professional reputation.

WHEREFORE, Plaintiffs pray:

## As to Count I

That this Court adjudge and decree that each and every Defendant has engaged in an unlawful conspiracy in restraint of competition in violation of Section 1 of the Sherman Act.

That Plaintiffs recover three times the damages determined to have been sustained and that joint and several judgments be entered herein against the Defendants for the amounts determined.

That each and every Defendant be preliminarily and permanently enjoined and restrained from continuing, maintaining, or renewing the restraint of trade alleged herein, including a temporary restraining order as appropriate, that Plaintiff Patel's privileges at Bayshore be fully reinstated,

and that Defendants refrain from reporting anything disparaging about Plaintiff Patel or any other physician associated with Plaintiff Mid-Atlantic Medical to any entity, including the National Practitioner Data Bank ("NPDB").

That Plaintiffs recover the cost of this suit together with reasonable attorneys' fees, and such other relief as the Court may deem appropriate.

## As to Count II

That this Court adjudge and decree that each and every Defendant has engaged in a violation of RICO.

That Plaintiffs recover three times the damages determined to have been sustained and that joint and several judgments be entered herein against the Defendants for the amounts determined.

That each and every Defendant be preliminarily and permanently enjoined and restrained from continuing, maintaining, or renewing this violation of RICO, that Plaintiff Patel's privileges at Bayshore be fully reinstated, and that Defendants refrain from reporting anything disparaging about Plaintiff Patel or any other physician associated with Plaintiff Mid-Atlantic Medical to any entity, including the NPDB.

That Plaintiffs recover the cost of this suit together with reasonable attorneys' fees, and such other relief as the Court may deem appropriate.

## As to Count III

That this Court adjudge and decree that each and every Defendant has engaged in a violation of ADA.

That Plaintiffs recover damages determined to have been sustained and that joint and several judgments be entered herein against the Defendants for the amounts determined.

That each and every Defendant be preliminarily and permanently enjoined and restrained from any interference with transfers of patients to a higher level of care at other hospitals, that Plaintiff Patel's privileges at Bayshore be fully reinstated, and that Defendants refrain from reporting anything disparaging about Plaintiff Patel or any other physician associated with Plaintiff Mid-Atlantic Medical to any entity, including the NPDB.

That Plaintiffs recover punitive damages in an amount to be determined at trial.

That Plaintiffs recover the cost of this suit together with reasonable attorneys' fees, and such other relief as the Court may deem appropriate.

## As to Count IV

That this Court adjudge and decree that each and every Defendant has engaged in a violation of NJLAD.

That Plaintiffs recover damages determined to have been sustained

and that joint and several judgments be entered herein against the Defendants for the amounts determined.

That each and every Defendant be preliminarily and permanently enjoined and restrained from retaliating against Plaintiffs in violation of NJLAD, that Plaintiff Patel's privileges at Bayshore be fully reinstated, that Defendants cease their intimidation and harassment of physicians associated with Plaintiff Mid-Atlantic Medical, and that Defendants refrain from reporting anything disparaging about Plaintiff Patel or any other physician associated with Plaintiff Mid-Atlantic Medical to any entity, including the NPDB.

That Plaintiffs recover punitive damages in an amount to be determined at trial.

That Plaintiffs recover the cost of this suit together with reasonable attorneys' fees, and such other relief as the Court may deem appropriate.

## As to Count V

That this Court adjudge and decree that each and every Defendant has breached the contract established by the Bylaws.

That Plaintiffs recover damages determined to have been sustained and that joint and several judgments be entered herein against the Defendants for the amounts determined.

That Plaintiff Patel receive preliminary and permanent injunctive relief, including a temporary restraining order as appropriate, ordering Defendants to fully comply with the Bylaws, to allow a secret ballot in a MEC vote with verification of the outcome by two voting members, to fully restore Plaintiff Patel's privileges, and to refrain from reporting anything disparaging about him or any other physician associated with Plaintiff Mid-Atlantic Medical to any entity, including the NPDB.

That Plaintiff Mid-Atlantic Medical also obtain injunctive relief ordering Defendants to comply with the Bylaws.

That Plaintiffs recover punitive damages in an amount to be determined at trial.

That this Court grant such other relief as the Court may deem appropriate.

## As to Count VI

That this Court adjudge and decree that each and every Defendant has tortiously interfered with the contract established by the Bylaws.

That Plaintiffs recover damages determined to have been sustained and that joint and several judgments be entered herein against the Defendants for the amounts determined.

That Plaintiff Patel receive preliminary and permanent injunctive

relief ordering Defendants to stop interfering with the Bylaws, to allow a secret ballot in a MEC vote with verification of the outcome by two voting members, to fully restore his privileges, and to refrain from reporting anything disparaging about Plaintiff Patel or any other physician associated with Plaintiff Mid-Atlantic Medical to any entity, including the NPDB.

That Plaintiff Mid-Atlantic Medical also obtain injunctive relief ordering Defendants to stop interfering with the Bylaws.

That Plaintiffs recover punitive damages in an amount to be determined at trial.

That this Court grant such other relief as the Court may deem appropriate.

## As to Count VII

That this Court adjudge and decree that each and every Defendant has defamed Plaintiff Patel.

That Plaintiffs recover damages determined to have been sustained and that joint and several judgments be entered herein against the Defendants for the amounts determined.

That Plaintiff Patel receive preliminary and permanent injunctive relief ordering Defendants to cease repeating, publishing or disseminating information about their improper summary suspension of Plaintiff Patel or

about any other physicians associated with Plaintiff Mid-Atlantic Medical, that Defendants refrain from reporting anything disparaging about Plaintiff Patel or any other physician associated with Plaintiff Mid-Atlantic Medical to any entity, including the NPDB, and that Defendants correct the false statements they did make.

That Plaintiffs recover punitive damages in an amount to be determined at trial.

That this Court grant such other relief as the Court may deem appropriate.

### **Demand for Jury Trial**

Plaintiffs hereby demand a jury trial pursuant to F.R.Civ.P. 38(b) for all issues triable by jury.

Respectfully submitted,

s/ Andrew L. Schlafly

Andrew L. Schlafly (AS4533)
Attorney at Law
939 Old Chester Rd.
Far Hills, NJ 07931
Phone: (908) 719-8608
Fax: (908) 934-9207
Email: aschlafly@aol.com

Attorney for Plaintiffs
Robert B. Patel, M.D., and Mid-
Atlantic Medical Associates, LLC

Dated:        May 23, 2012

<u>**CERTIFICATION PURSUANT TO L. CIV. R. 11.2**</u>

I, Andrew L. Schlafly, counsel for Plaintiffs Robert B. Patel, M.D., and Mid-Atlantic Medical Associates, LLC, do certify that the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or governmental administrative proceeding. Bayshore Community Hospital is obligated to arrange a private, internal hearing concerning a subset of the issues raised by this Complaint, but it is unlikely Bayshore will comply fully with its obligation.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.


<u>s/ Andrew L. Schlafly</u>

Andrew L. Schlafly (AS4533)

Attorney for Plaintiffs
Robert B. Patel, M.D., and Mid-Atlantic Medical Associates, LLC


Dated:      May 23, 2012